May it please the Court, I would respectfully request to reserve five minutes for rebuttal. All right. Try to keep track of your own. If I notice, I'll tell you when you have five minutes, but you have a clock there, so try to keep track of it. Thank you very much, Your Honor. If it please the Court, this is an action that's brought under Section 4 of the Clayton Antitrust Act alleging against the defendants a violation of Section 1 of the Sherman Act. The case was decided below, by the court below, in which the court granted summary judgment in favor of the defendants and denied the plaintiff's motion also for summary judgment. The thrust of our claim, of course, the standard of review on the case is de novo, and the thrust of our claim is that the activity is a price-fixing conspiracy or combination, that it is per se illegal on its face, and that at the very least it is subject to the quick-look doctrine. There's no question in this case with regard to interstate commerce, and there's no question in the case with regard to whether or not the combination or conspiracy element of Section 1 has already been proven. The case itself is very simple. Shell in Texaco and Saudi formed different companies for the purpose of their downstream or so-called marketing aspects of their business. They then, although they kept the businesses separate in the sense that they kept the different trademarks of the Shell Oil Company and the trademarks of Texaco separate and apart, that they then, by their group, which was the original competitors who formed the group and who were the members of the committee, then set the same identical prices for Shell in Texaco throughout the United States. Under both the basics. Kennedy. Counselor, let me ask you a question to try to get myself in focus on this. They put together this joint venture, and let's say for the moment joint ventures are okay. Maybe they're not, but let's say they are for the moment. If they had said they unified all the refineries go together and except for me for a moment that the cost of the gasoline, manufacturing the gasoline is the same for both. Whether you call it Texaco or you call it Shell or whatever you call it, it's the same cost. Added its cost about the same, refining cost same, everything's the same cost. Now, given that, if they had set Texaco gasoline at X and Shell at Y, you would say there's no price fixing. Is that right? In that situation, of course, I do not agree with your honor's premise. And I don't believe I do not believe I do not agree with your honor's premise. And I do not believe that the Supreme Court would consider this a legitimate joint venture either, of course. Never mind that. Because if it's not a legitimate joint venture, it's not legitimate. And there we are. But what the focus is, you said a moment ago, was the fact that they set the prices the same. And my question to you is, suppose the prices were fixed differently, two cents apart or whatever. Then what? It's the same rule, Your Honor. You can't fix the price. The market is to fix the price. These competitors are not to fix the price. So what you're saying to us is not so much that they went in and they sold Shell and Texaco at the same price. That's irrelevant. But the only thing that's relevant is that once this joint venture is in business and has unified all these refineries and all the downstream stuff, once it's in business, that's bad per se. It doesn't matter where they set the price. It's no good. Is that correct? No, Your Honor, it is not. We're saying very simply, Your Honor, that the agreement to fix the price is illegal and always has been, period. And if you're going to ---- Okay. But it doesn't matter where the price gets fixed. If it's fixed differently, it's still fixed price as far as you're concerned. No, Your Honor, as far as the Supreme Court is concerned. Never mind as far as the Supreme Court. Okay. What you are saying to me is, of course, I don't care what you don't care what I think personally and vice versa. I absolutely do care what you think. What does the law tell us? And you would say the law tells us that it's not the fact that Shell and Texaco are set at the same price. It's the fact that Shell and Texaco prices were set at all. By agreement. By this venture. By agreement. By this venture. By agreement among competitors. By the people that are running the venture, which are the competitors. Used to be. Supposedly. But are, are competitors outside of the United States. Right. So this only applies to the United States. So your price fix is the fact that any price was put on this gasoline. Agreement, Your Honor. Agreement to fix prices by competitors is illegal per se on its face. And in the first case, which is the Ciccone vacuum case, the Court may remember that in fact the prices were set at different levels. It was the fact of the agreement among competitors that the price was fixed, not according to the market. And I think that it's important that the court should understand, should understand the true effect of that. When they were, when they were speaking, for example, this is a telling quote. This is from the chairman. These are all the quotes I'm giving you are from the chairman of the boards and the chief executive officers and the senior vice presidents of marketing. For these two companies, Shell and Texaco. I assume they're from the record. It is, Your Honor. And this is at volume two at page 163 of the record. It is the deposition of Mr. Tilton to give the court a flavor as to what we're talking about. The question was, question now. Well, you said that you still compete vigorously against Shell elsewhere in the world. Answer. Yeah, vigorously. Probably understates it. Question. Okay. So elsewhere in the world, an objective would be, although you might not be able to achieve it in a particular market, to get all the Shell business and reduce the Shell market share, say, to zero if you could do it. Right. Answer. If I could do it, I'd do it. But that's not the case in the United States. Answer. We're partners in the United States. Same brand, same company, same group. And in addition to that, although the reasons are not required, because when it's a per se offense, the question is, the question simply is, did you, in fact, fix the price? And that, of course, is agreed, and that's under, if it pleases the Court, that's under our, in volume one, under the agreed facts, that's at page 37, and it is paragraph 62, which states as follows, this is agreed, prior to the formation of Equilon and Motiva, Shell, Texaco, and Star, separately and independently set prices for the Shell and Texaco brands through their own pricing departments. After the formation of Equilon and Motiva, the pricing was consolidated so that one person at Equilon set prices for both the Shell and Texaco brands in any given Equilon pricing area, and one person at Motiva set prices for both brands in any given Motiva pricing area. Equilon and Motiva each set prices for Shell and Texaco branded gasoline in thousands of distinct geographic areas throughout their respective regions of operations. Counsel, could I ask you a question regarding the standing of your clients to pursue the action against Star Enterprise? Yes, Your Honor. We, our claim is very simple on that. I think it's an ancient one. If a member, if someone is a member of a combination, and they are working together for a common, common objective, each member, even though we don't deal with the member, each member is liable to the plaintiffs, whether the plaintiffs deal with them or not. In our case. What's your best case authority for the proposition that even though Star was not involved in setting the prices on the West Coast and your clients never had any dealings with them, that there is nevertheless a standing? What's your best case authority for that proposition? Well, this is, this operates like a cartel, Your Honor. And so the best case would plainly be, obviously, Ciccone Vacuum. But if it's for, if it's an effort to try to show the standing of a plaintiff, we are purchasers of part of the combination. In this case, Saudi is a member of the non-compete agreement with Shell in Texaco. Texaco and Shell on the West Coast have their own non-compete agreements with each other. Supposedly, SRI or Saudi Arabia, that's who it is. Those are the ones who signed the documents. Supposedly, Saudi Arabia is free to compete on the West Coast, but doesn't and hasn't. And as a matter of fact, probably can't or won't. But the fact of the matter is that they do not. If they did, they would obviously destroy the price structure. That's part of it. That's why when we talked about Citizens Publishing Company, that the very fact, the very fact of that situation would be the same here. We also want. Evidence in the record supports the involvement of SRI in the price case. And what do you rely upon in the record? You read some things to us regarding the other participants, but what evidence is there in the record of Star implicitly in the price case? Star, Your Honor, is a combination of Saudi refining and Texaco. And from the very statement I made, which is agreed, Star is included. The statement is, prior to the formation of Motiva, Equalon and Motiva, Shell, Texaco, and Star separately and independently set prices for the Shell and Texaco brands. Star marketed under the Texaco brands through their own pricing departments. So independently, they used to do it before. After the formation of Equilon and Motiva, the pricing was consolidated, including Star. Pricing was consolidated so that one person at Equilon set prices for both the Shell and Texaco brands in any given Equilon pricing area, and one person at Motiva set prices for both brands in any given Motiva pricing area. Did Star ever do business on the West Coast? I don't. It did in terms of, I'm not sure. Frankly, Your Honor, I'm not sure. The evidence is very clear, however, that they were only going to form one company originally. The only reason that they formed the West Coast, which ended up to be Equilon, and the East Coast, which ended up to be Motiva, was because of some issue with regards to Saudi Arabia approval and how fast they could move. Now, let me also say, as another sign of the effectiveness of this group, first of all, they controlled well over 15 percent of the market throughout the United States, more than twice than anyone else at the time. But also, 25 percent of the market on the West Coast. And when they were formed, right after they were formed, in the beginning of 1999 and the end of 1998, crude oil prices were at their lowest since the Depression, taking into account the inflation. So the lowest since the Depression, that was at $10. And in the face of that, this combine increased its prices. And we have those examples in Los Angeles alone, from 60 cents to some 40 cents more, a dollar, more than a dollar. And this is what they did throughout the country. And it was notwithstanding the fact of the crude oil being the lowest it had ever been before. In addition. Did they increase them beyond the other companies? The other little outfits like Tosco and such? Tosco at the time. By the way, I think as a matter of fact, I'm trying to think who owns Tosco now. I forget, Your Honor. But Tosco was at the time a refiner. I do not believe that they were in the retail business. Tosco owns Union Oil. That's another. That's a combine that came later, I believe, Your Honor. And I will see. I think it owns BP. No, Your Honor. I think it goes like this. I think British Petroleum bought Standard Oil of Ohio in Cleveland and British. Then they bought Amoco in Indiana, Standard Oil of Indiana. And then BP AP bought Tosco. Well, what happened when they raised their prices from 60 cents to a dollar or whatever? What happened with the other companies? Whatever. We're not sure what the other companies did. We have all the prices for our group. As far as we know, they maintain the prices and make profits off of them. Their purpose, their announced purpose, Your Honor, in getting into the combine was that if they started cutting costs, this is an incredible statement. It is typical cartel. If they started cutting costs, then the other companies would start cutting costs. And then whatever they gained by cutting the costs, they would compete away. In other words, they would lose it to the consumers. Only if they formed the alliance could they stop that. And the evidence is very clear that any cost that they, in fact, were able to save was not passed on to any of the consumers. And that in addition to that, none of these so-called efficiencies that they claim in this phony claim that they are part of a joint venture, that none of the so-called efficiencies or the cost savings or any of them had anything to do with pricing. In other words, the prices were not necessary. Fixing the prices were not necessary. This is what the officers say. And I. And that's not what I understand. That's what I don't understand in your presentation. So I was trying to ask you about before. If I understand it, it seems to me that you're saying the joint venture itself is what's bad. It's no good because competitors can't come together and put together a joint venture like this. Correct. Never mind the prices. Even if the prices, whatever the prices were set at was going to be no good. You know, I do respect you. I believe that you have it. I'll do it backwards. Competitors are not allowed to fix prices and you can't make up a reason for doing it. And in this case, the reason they made up was a joint venture. Let me try to ask it somewhat differently. Suppose we forget the prices for a moment. And in fact, they did what you would like them to do. After they had this joint venture, each one of the original companies went off on its own, set its own prices. They weren't the same. They competed directly. But they just didn't manage to combine those other facilities prior to the sales. And they did think they were accomplishing something by forming that joint venture for the parts of the operation prior to the actual sale. Would there be anything wrong with that? No, Your Honor. That's Citizens Publishing. Okay. So that would be a legitimate joint venture. Yes. The only thing that makes this illegitimate is that they then fixed the prices. Also like Citizens Publishing. Yeah. The fixing of the price. All right. The fixing of the price had nothing to do with the so-called efficiency. And that's your second part of your argument, is that the fixing of the prices was in no way necessary or a reasonable result of the fact that they did form a joint venture. There was no reason, having done that, that they had to fix the prices. That's correct, Your Honor. The testimony is very clear on that. This is the testimony of Mr. Peter Bajor, the chief executive officer of Texaco. It's in Volume 4, beginning at page 693. Page 694 of the transcript in Volume 4. Question. Did the pricing have anything to do with the cost savings? Answer. No. Page 695. This is him. No question. He's got to make the point himself. He says, let me say something here. This is Volume 4, 695. Let me say something here with respect to this, because I think this is important. All the synergies, all the cost savings, and the figures which we calculated had nothing to do with pricing, nothing. I never remember once in any form discussing the price issue. It never came up. So the question is, originally, the court below, when it denied the motion under Rule 12b-6, they said, going back to the old Addison-Pipe case, well, you can't do a restraint unless it's necessary to accomplish the so-called efficiencies, like the BMI case. And so we went there. We say, okay, did you have to do this pricing in order to achieve these efficiencies? No. Did you have to do the pricing in order to save the cost? No. And by the way, that continues. That language continues, because we have the testimony from each of these people as they write down the line. Here's the fellow from Shell. Quote, this is also Volume 4, 698. Quote, are there any cost savings that you are aware of that are attributable to charging the same prices for the Shell and Texaco brands in the same pricing zones? Answer, not that I'm aware of. This follows the CEO of Motiva. Then, of course, we go on. I mean, every one of them. We went through every one of them. After Motiva was formed, this is the other one. This is Mr. Larry Birch. After Motiva was formed, you implemented this policy of charging the same price for the Shell and Texaco brands in the same area? Yes. Okay. Were there any cost savings or synergy that resulted from doing that? No. Counsel, you keep saying you keep that's where I got out of your briefs and that's what I got from the record. I don't know if you're talking about the same prices, but I think you just told me it doesn't matter if they put the same prices or not, correct? It doesn't the same price is irrelevant. That's a red herring, correct? No, Your Honor. You told me at the very beginning of this argument. Same, Your Honor. If it said different prices, it would still be a violation. Oh, yes. It would be. We don't have different prices here. We have the same prices. That's what I said. So it's irrelevant whether it's the same or different, correct? Your Honor, the only point is, did they agree to the prices, regardless of whether they're the same or not? I hear you. I said you keep saying same price. It doesn't matter if it's the same price, though, does it? Not if it's by agreement. Thank you. Sorry, I didn't answer that directly. I thought I had, Your Honor. I apologize. There's no question. You wanted to save five minutes and you now have five seconds. But we'll give you a little time for rebuttal anyway. All right. I just want to end by just saying this. In the Supreme Court decision in NCAA, in footnote 39, they said there's no question that a court would strike down a similar situation if it were Ford and General Motors and they both had some company and a selling agent selling both at the same price. They said that could be decided without a trial. We agree with that, too. That's footnote 39. Thank you very much. Thank you. Thank you, counsel. Good morning, Your Honor. I'm Stuart Senator representing Shell Oil Company, and I'll give the argument on the common issues. Mr. Huster, representing Saudi Refining, will address the standing issue that relates solely to Shell. How are you planning on dividing your time? I was thinking about 16 minutes and 4 minutes. Okay. And that was agreed to before I said it. That's fine. I hope somebody's going to keep track of it. The clock counts downward, by the way. Excuse me, Your Honor? The clock counts down. Yes, Your Honor. Some people get confused about that. Your Honor, we believe — Mainly the presiding judge. Okay. This is a simple and straightforward case, and we believe Your Honors have put your fingers on the fundamental equivocation in the plaintiff's argument, which is whether the ventures, when set up, were legal or whether, granted that they can make pricing decisions, can one of the options be to price the two brands the same. And those are two fundamentally different questions that they equivocate on throughout their presentation. I didn't hear any equivocation. I mean, I thought Judge Fernandez fairly successfully clarified. The position was that it is illegal to fix prices whether they're fixed at the same level or not. That seemed to have been cleared up in the discussion. Well, I appreciate that, Your Honor, because that seems to me to be the only argument that, you know, that can be discussed. The idea that if you can set prices, you can set them anywhere but the same just doesn't make sense to me. And the point I want to make initially is that every single deposition excerpt that was read, every question that's asked about efficiencies relating to prices talked about is there an efficiency pricing the same, not is there an efficiency in pricing within the ventures. I'd like to start, Your Honor, if I may, with just a brief discussion of the fundamental structures of the ventures, because I think that's very important to the analysis. And there's no dispute in these arguments that these are bona fide, real, integrated joint ventures. There's one in the west and one in the east. The counsel does that insulate from antitrust liability simply because the joint ventures are bona fide? When the joint ventures are bona fide, it doesn't insulate from antitrust liability under the rule of reason and a strict examination of these ventures and their potential anti-competitive effects. It insulates from per se? It does insulate from per se liability as long as any restraint being challenged is ancillary to the reasonable purpose of the joint ventures. Okay. What case authority, what's your best case authority to support your argument? The Arizona, the Maricopa County case, the Cal Dental case. So you're resting your argument on the theory that the price fixing was ancillary to the economy that were, that resulted from the joint venture arrangement? I wouldn't call it price fixing, Your Honor, but that the inclusion of the price setting function in the joint ventures was ancillary to the joint ventures. Absolutely, Your Honor. Well, it's an odd, kind of an odd term. We did say it was a little more than ancillary, but we used that word. It started out with the Supreme Court, which used the term necessary. And we then sort of modified it slightly to ancillary. But it's not at all clear what ancillary means. It seems to mean some need to or reasonable basis for having to do this. To set the price has to be, if I could say, reasonably ancillary to legitimate cooperative needs. Right. What is the need and the reason that you have to set prices? I understand the reason that you have to consolidate all of the facilities, how that saves you money. What do you do for yourselves by setting prices, having one person set prices instead of having two people independently, where you might just not have arrived at the same price? You have set up. And done independently. Now, I realize it doesn't matter that they arrived at the same price. But it is an interesting fact that when one person sets it, you may arrive at the same price. But what is the reason for having one person set the price for the two products? You have set up, or we have set up, a production and marketing joint venture. Two production and marketing joint ventures. But to simplify it, I'll just talk about them individually. The venture owns, buys the inputs, manufactures the product, owns the product, and then sells the product. In order to sell the product, the venture has to price the product. It's its product that it has made and that it owns. And there's nobody else who has the right to set the price for that product besides the venture. Shell and Texaco, after this is done, are no longer retailing, at least in this area, are no longer retailing gasoline at all. Correct? They're not selling gasoline to distributors. In fact, as I recall, we have a case that the venture got in some trouble under the PMPA because it's so separate. The whole thing has been separated off. They are no longer in any of the downstream work. They don't refine. Am I correct? Right. They're out of the market. They don't refine. They don't distribute. They don't do anything. Is that right? That is correct. They are out of the market. There's Equilon manufacturing, owning, selling gasoline, and there's Motiva, manufacturing, selling and owning and selling the gasoline. And the law is clear that a manufacturer, somebody who manufactures and owns and sells a product, has to set the price for the product. And who else but the one who owns the product would set the price for the product? There's no rationale for Shell, just because it is the licensor of the Shell trademark, to dictate the price that Equilon sells the gasoline that Equilon owns. There's no rationale for Texaco to dictate the price that the licensee, Equilon, uses, just because Equilon happens to put the name Texaco on some of its gas or the name Shell on some of its gas. That doesn't give the licensor, who's not in the market, who's not competing, who has exited, any right to set the price. You could look at it as, look at Saudi Refining and Motiva. It's sitting there as part of this venture. The gasoline is owned by the venture. Why should these other two entities have the right to set the price for the gasoline and make such an important decision? I mean, it's a little difficult, maybe for stepping back from the law a minute, to get the idea that two people get together, form a joint venture. And those two, with their two products, they form a joint venture, they sell the two products together, but neither of those businesses, you say, really is in the business anymore. It's some other entity that those two businesses are composed of, but those two businesses don't even exist anymore. Right. It's like a merger of the downstream operations. And just like a merged company would be setting the price because it owns the product, here, Equilon or Motiva, the joint venture, is setting the price. Its shareholders happen to be Shell, Texaco, and in the case of Motiva, SRI. But it is a company that owns a product and has to sell it. Now, the two companies couldn't just get together and do this. They can form a joint venture to do it. The distinction, I believe, that applies to what Your Honor is discussing, is the distinction between a joint selling arrangement and a manufacturing and marketing joint venture. The two companies couldn't get together. For example, GM and Ford couldn't get together and say, we'd like somebody else. We're going to manufacture our cars, we're going to sell our cars, but we'd like a third company to set the prices and distribute them. Because Ford's still manufacturing the Ford cars. But they can get together and say, we'd like to do this together. We'd like to manufacture our two cars together using the same plant. And once we use the same plant, then we can fix the prices. It's not just using the same plant. It's manufacturing the cars as a jointly owned product in which both of them have their capital at risk and are involved. And Professor Hovenkamp, in his treaties, makes this distinction quite clearly. And we cite this to the Court. In Section 1908E, he talks about a joint venture between, I believe it's Toyota and GM, to manufacture a particular car, say a low emissions car. And they jointly manufacture, own, and sell the car. And he says, once the automobiles are manufactured, they are jointly owned and cannot be sold without an agreement between the owners as to the price that will be charged for them. That's one car. He doesn't say they can each – you can manufacture Toyota and Chrysler by getting together and do it and sell the two separate products and have the two companies decide on each other's products by forming a joint venture. He talks about manufacturing one product. Well, the distinction is whose product isn't. If there are separate products still being separately manufactured by each of the companies and each of the companies owns its own products here, I think GM and Toyota, if they just happen to be using the same price but they retain ownership of the product, then obviously GM is going to be setting the price for its cars and Toyota for its cars. Now, our suggestion was that the professor didn't deal with the problem that we have. He dealt with the problem of the two companies getting together, manufacturing a single product. Well, I don't think he dealt – That's what he was dealing with. I think it is, in fact, the same situation. The difference is – or the distinction you're referring to is that there are a combination of all the downstream assets here where he's thinking of a combination of downstream assets and just one particular product. And joint ventures can take many forms based on the particular efficiencies to be gained. And obviously I'm not saying that any of these joint ventures are not subject to antitrust scrutiny. Here, the antitrust regulators looked at these ventures under the rule of reason for more than a year and looked at all the efficiencies that were claimed, looked at how the markets would be affected, and they came to a reasoned judgment that this was not anticompetitive. In fact, that this is a pro-competitive set of joint ventures. Counsel, what's your response to opposing counsel's pointing to the fact that the food prices were down and yet the prices that were fixed by the joint venture went up as evidence of price fixing? The district court looked at this, and the district court said, there are a lot of players in this market, prices change in this market, there was no evidence whatsoever presented to the district court that any change in the overall prices in wholesale prices of gasoline were caused by these ventures. No evidence whatsoever was introduced on that point. So it's an interesting phenomenon that prices fluctuate. They fluctuate because a refinery has a fire. They fluctuate for a variety of reasons, but there is no cause and effect in this record here. I'd like to make one further point on this idea of joint ventures who are production and marketing joint ventures of necessity being permitted, required to price the products that they sell. I would suggest, and the district court suggested, that there would be a greater antitrust problem if we have the licensor of the brand, either Shell or Texaco, setting the price for the licensee's product that the licensee manufactured. And we, in fact, cited a case to the court where I think it was the Fifth Circuit said found it illegal for a licensor to dictate the price that a licensee charges in making what is the licensee's product, although the licensee has a license to make the product. That doesn't give the licensor the right to get in there and set the price. Now, Mr. Aliotto, in his argument, referred to, at the very end, to a joint sales agent. And he cites this passage in his brief as well, I think at page 35 or so, where he says it would be illegal for two car companies to get together and have a joint sales agent, as we've been discussing, and sell and set the price through a joint sales agent. Echelon and Motiva are not joint sales agents. This is precisely the distinction that Professor Hovenkamp has drawn between situations where you have the joint ventures manufacturing the product, owning the product, and of necessity having to set the price at which they sell the product. And we also ---- The testimony that he's ---- Right, because they've exited the market here. And the joint ventures only operate in the United States. They only set their own prices in the United States. The joint ventures have no life outside of the United States. They're not involved in that. How do you distinguish citizens, then? Is it because the citizens were still really ---- the joint ventures themselves were really still manufacturing the product? Yes, the individual entities were still making the products. They kept their editorial and news departments separate. They're still really making them, and in competition with each other. They're still making the products, but then they have this joint selling arrangement where they say, well, we're going to set advertising and subscription rates jointly. But they're still competing against each other, and that's not what we have here. What we have here, as opposed to in citizen, is the venture owns the product. The venture manufactures the product. So in citizen, to put it in some antitrust terms, the price-setting function is not reasonably ancillary because it's more like a joint selling arrangement than a manufacturing and production joint venture. And I see my time is running short, but let me just conclude by mentioning that we put ample evidence in the record that placing the pricing function, leaving it in Shell and Texaco, not only would raise antitrust concerns that would just not make sense, since Shell and Texaco don't own the products, but would also be completely inefficient, would not let the joint ventures function properly because pricing is so connected to other decisions like operating costs, margins, sales volume, and available inventory, you can't have one company making a pricing decision and another company making all those other decisions. They have to be melded together. So even if you do, you know, even if you get over the point, which I think is clear in the case law, that a manufacturing and production joint venture of necessity sets its prices and there's absolutely nothing wrong with that. There are additional efficiencies and reasons why it just was unworkable to put the pricing function or leave the pricing function in the parent companies. Okay? Breyer. Michael Schuster for Appellee SRI. Permit me to begin by responding to Judge Reinhart's question as to whether STAR or SRI ever did business in the western United States. Counsel responded he wasn't sure. The answer is no. The relevant record sites are at page 40 of Appellee's brief, and the record sites are pages 31 to 32 and 36 of the record. Now, let me just back up. There is no nexus whatsoever between the plaintiffs in this action and SRI. The plaintiffs in this action are service station owners and operators in the state of California. SRI, the record shows, never owned any assets, did any business, participated in any pricing decisions in the western United States, let alone in the westernmost state. Now, in this, the Ninth Circuit held and stated clearly in the California comp case, computer's case, 1979, that in order to have standing to assert a Sherman Act claim, a plaintiff must be able to show causal antitrust injury. Antitrust injury is injury of the type that the antitrust laws were designed to prevent. Causal antitrust injury means that the plaintiff's injury, even if it's cognizable as an antitrust injury, must have an appropriate causal nexus with the conduct complained of. And other cases make clear, like Lamar, that plaintiffs have to have an appropriate nexus with each defendant in the action. Here, that never happened. The plaintiffs never purchased any product from SRI. That was true when SRI was prior to the formation of the joint ventures, and it was also true once Motivo was formed and operated in the eastern United States. There is half a continent separating these plaintiffs from SRI. Plaintiffs, the appellants, try to salvage standing by making a nationwide conspiracy argument and arguing that SRI was part of a nationwide conspiracy. There is absolutely no evidence in the record that SRI participated in any agreement or in any negotiations or discussions concerning pricing in the western United States, let alone in California. Because SRI was not a co-owner of Equilon, it had no motive and no opportunity to participate in any such pricing decisions or in any way to change the conduct that it engaged in before the ventures were formed. So it's really very simple. It's not a close question. These plaintiffs simply lack the standing under Section 4 of the Clayton Act to assert a Sherman Act Section 1 claim against this defendant. Thank you, counsel. Thank you. May it please the Court. Your Honor, I asked counsel which case you would rely on. He said Arizona. The Arizona case. In fact, the Supreme Court found that the price fixing was ancillary and was not ancillary, was unnecessary, and struck down the price fixing as being per se a violation of the law. At that time, the Court said, this is the Supreme Court, it said the anti-competitive potential inherent in all price fixing agreements justifies their facial invalidation, even if pro-competitive justifications are offered for some of them. And the Court went on to say, even if a fee schedule is therefore desirable, it is not necessary that the doctors do the price fixing. So, counsel, in your view, who should have set the prices or what entity should have set prices? In the Supreme Court's view, the doctors should set them, not by agreement. So they would set their own prices. In this case, what's your position regarding how the prices should have been fixed after the joint ventures were formed? By the market. You remember, Your Honor, they organized it. No, no, no. Somebody is going to say the gas is sold for $5.20. Judge Rawlinson's question is, who should say that Texaco's gas, after this joint venture is formed, who should say that Texaco's gas will be sold at $5, Shell's will be sold at $6? The Texaco officials and the Shell officials, independent of each other, as they did for eight months. As they did for eight months and as they do elsewhere outside the United States. They did not, again, to set the price because they were forming their committee. And by the way, on the committee's judges, that's all right. And if I can just, if I can deviate just for one minute, Your Honor, if the court would look at pages 9 and 10 of our reply brief and the portions of the record cited therein, it's all of the combinations of the participants by the Saudi Arabians for both, for both Motiva and Equilon, being on the original group that made the decisions. Let me ask you one question that seems a little more basic. Judge Fernandez asked how your opponents distinguished Citizen News, which I think is probably your case in which you rely the most strongly. And they answered that the distinction was that in this case, both companies put their products into the joint venture. The joint venture owned the products. And in Citizen News, that was not the case. What, do you agree with that distinction? And if so, what do you, what's your response to that? They used, as the Supreme Court cited in Citizens Publishing, they used the same mechanism as is used here that was used by Morgan in the Northern Securities case cited by the Supreme Court in Citizens. They formed a third-party company which owned, all the assets were then put into those companies. And those third-party companies, supposedly third-party and disinterested, now owned the assets. And then they fixed the price through that company. In the Citizens Publishing, the two newspapers organized a third party, just like Northern Securities, and this third party, then the assets were put into the third party. And they combined, and they combined their assets. They combined all assets except for the editorial and so-called reportorial aspects of the newspapers. The price fixing, then, as the Supreme Court said, had nothing to do with the so-called reason for the joint venture. I also want to point out, so the counsel's recitation of that case is incorrect, and the case is very clear about it. The judge below misunderstood the fact that the Supreme Court said there were three separate violations. The judge below thought those were the reasons why the court was saying that the price fixing was per se. I want to say also, too, there's one real, there's one real joint venture case, and it is BMI. And in BMI, they allowed the price fixing only because they could get a new product that either one of them could otherwise do independently. That was the reason and justification by the Supreme Court. And what the Supreme Court said is notwithstanding that, those people still could compete independently. And in this one, this is turning the antitrust laws on their head. In this one, they say, well, since we have abdicated all responsibility, and we don't compete with Motiva and we don't compete with Equilon, that that should be a saving grace for us. No, it's not. That shows that it is not a BMI case, and it shows it's not a joint venture case. What's your response to opposing counsel's articulation of the fact that the regulators have put their stamps of approval on the joint venture and the pricing? The Supreme Court has been clear about that, that courts might consider that, but it's irrelevant to the determination. In the Supreme Court's Ciccone vacuum case, when the Secretary of the Interior okayed the price fixing because it was during the Depression and they were trying to keep the hot oil that was coming out of East Texas off of the market, the Supreme Court said that even the Secretary of the Interior was a mere volunteer. There is no statute that exempts them from the law, and so it applies. What's a little different is that the attorneys general and FTC were involved. These are the people who regulate this area. So wouldn't you agree that's a little different? No, I don't, Your Honor. The decisions or any decision by the attorney general does not give them immunity for the violations, and the Supreme Court is very clear about that, and that is to be viewed separately and apart. It doesn't make any difference. And as a matter of fact, there's a big issue as to whether or not it would even be allowed to be put into evidence in a trial. If I can do citizen's utility just for one second, Your Honor. One second, all right. Well, not quite one second. Thirty seconds. Okay. What is remembered in citizen's utility is, again, that was a — I mean, not in citizen's utility, citizen's publishing, is that that was a case in which it was granted the price fixing was found to be per se and that it was summary judgment in favor of the plaintiffs, the government at that time. And the Court said the Section 1 violations are plain beyond pure adventure. And the Court said that the price fixing is illegal per se, and so it doesn't make any difference for the reason given. And I would finally say, Your Honor, that with regard to ancillary, that whole issue comes from Addison-Pipe and Justice or then-Judge Taft had the kinds of reasons or the kinds of situations in which it would be ancillary. Generally speaking, if you sold a business and you got out of the business, you could agree for a short period of time not to compete in a very limited area. And, by the way, this joint venture then dissolved after the five years, and now they're supposed to be competing again. Thank you. Thank you, counsel. Thank you all. One mistake that I made in answering Judge Ross's question. I mentioned a countable case. I meant the BMI case when I was talking about papers. Thank you. Thank you. Thank you all very much. That was very entertaining. Thank you.
judges: Reinhardt, Fernandez, Rawlinson